UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

FLOWRIDER SURF, LTD., a Canadian corporation, and SURF WAVES, LTD., a company incorporated in the United Kingdom,

Plaintiffs,

v.

PACIFIC SURF DESIGNS, INC., a Delaware corporation,

Defendant.

Case No.: 3:15-cv-01879-BEN-BLM

**ORDER:**

**(1) GRANTING PSD's MOTION TO DISMISS U.S. PATENT 6,491,589 FOR LACK OF SUBJECT MATTER JURISDICTION (ECF No. 102);**

**(2) DENYING PLAINTIFFS' MOTION TO SUBSTITUTE PARTIES (ECF No. 106);**

**(3) DISMISSING U.S. PATENT 6,491,589 AND PLAINTIFF FLOWRIDER SURF, LTD. WITHOUT PREJUDICE;**

**(4) DENYING AS MOOT PSD's MOTION TO STAY PENDING INTER PARTES REVIEW (ECF No. 142);**

**(5) GRANTING PSD's RENEWED MOTION TO STAY PENDING INTER PARTES REVIEW (ECF No.**

**169); and**

**(6) STAYING ACTION.**

AND RELATED COUNTERCLAIMS.

This is a patent infringement action, in which Plaintiffs FlowRider Surf, Ltd. ("FlowRider Ltd.") and Surf Waves, Ltd. ("Surf Waves") allege infringement of U.S. Patent Nos. 6,491,589 (the "'589 patent") and 8,088,016 (the "'016 patent"). Presently before the Court are Defendant Pacific Surf Design, Inc.'s ("PSD") motion to dismiss the '589 patent for lack of subject matter jurisdiction (ECF No. 102, 112),[1] Plaintiffs' motion to substitute parties pursuant to Federal Rule of Civil Procedure 25(c) (ECF No. 106), and PSD's motion to stay pending *inter partes* review (ECF Nos. 142, 169).[2]

PSD's motion to dismiss and Plaintiffs' motion to substitute concern the same issue: The chain of title to the '589 patent and Plaintiff FlowRider Surf, Ltd.'s standing to bring this lawsuit. Standing is a constitutional requirement pursuant to Article III that can be raised at any time. *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1363 (Fed. Cir. 2010). "A court may exercise jurisdiction only if a plaintiff has standing to sue on the date it files suit." *Id.* at 1364. If a plaintiff lacks standing at that time, the Court lacks subject matter jurisdiction and the case must be dismissed pursuant to Rule

---

[1] PSD originally filed this motion under seal at docket entry 102. The Court denied PSD's request to seal the documents in part, and PSD re-filed the motion and exhibits at docket entry 112. All further citations will refer to the motion at docket entry 112.
[2] PSD initially filed its motion for a stay at docket entry 142. The Court granted PSD leave to file a renewed motion to stay once the Patent Trial and Appeal Board of the U.S. Patent Office ("PTAB") decided whether to institute *inter partes* review on both patents-in-suit. PSD filed its renewed motion at docket entry 169. The Court thus **DENIES** PSD's initial motion to stay as moot. (ECF No. 142.)

12(h)(3).  In patent cases, standing is a matter of who holds "all substantial rights" to the patent.  *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005).  Because standing is a threshold jurisdictional issue, the Court addresses FlowRider Ltd.'s standing first.

## I.    Background on FlowRider Ltd.'s Standing

In the Complaint, Plaintiffs asserted the following about FlowRider Ltd.'s ownership of the '589 patent and corresponding standing:

> On January 31, 2014, Plaintiff FlowRider acquired a license to all rights in the '589 Patent from Surf Park PTE, LTD., together with the other intellectual property rights for the underlying technology through an Intellectual Property License Agreement.  Under the terms of the Agreement, Plaintiff FlowRider is the exclusive worldwide licensee of the '589 Patent and has the right to enforce the intellectual property rights, including bringing actions for past patent infringement regarding the intellectual property.  Accordingly, Plaintiff FlowRider has standing to sue for infringement of the '589 Patent.

(Compl. ¶ 11; *see also* Decl. of Justin M. Barnes In Support Of PSD's Mot. to Dismiss ("Barnes Decl."), Ex. C, Am. Disclosure of Asserted Claims and Infringement Contentions at 9 (providing same explanation), ECF No. 112).  In discovery, Plaintiffs added that chain of title passed from inventor Thomas Lochtefeld to Light Wave, Ltd. and from Light Wave, Ltd. to Surf Park PTE, Ltd. before passing from Surf Park PTE, Ltd. to FlowRider Ltd.  (Barnes Decl., Ex. D, Pls.' Suppl. Resps. To Def.'s 2d Set of Interrogs. at 6-7.)  PSD argues, however, that this is not the complete story.

Indeed, the picture is more complicated.  PSD points to other license agreements that either break the chain of title or demonstrate that FlowRider Ltd. is not the exclusive licensee of the '589 patent rights.  Because the Court must trace the chain of title to determine standing, *see Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 777 (Fed. Cir. 1996), the Court identifies the transfers of the '589 patent below, in chronological order.  The Court identifies the various entities by their full business names for clarity where necessary.

1.     2000 Assignment from Lochtefeld to Light Wave, Ltd.

Thomas Lochtefeld invented the '589 patent. (Barnes Decl. Ex. A.) In October 2000, before the patent issued, Mr. Lochtefeld assigned "the entire right, title, and interest throughout the world" in the yet-to-be-issued '589 patent to Light Wave, Ltd. ("Light Wave"), a company owned by Mr. Lochtefeld. (*Id.* Ex. B.) On December 10, 2002, the Patent and Trademark Office issued the '589 patent, with Light Wave as the assignee. (*Id.* Ex. A.)

2.     2003 License from Wave Loch, Inc. to Aquatic Development Group, Inc.

On September 26, 2003, Wave Loch, Inc., another one of Mr. Lochtefeld's companies, granted Aquatic Development Group, Inc. ("ADG") an exclusive, "non-transferable right and license to use the [the '589 patent rights] . . . to manufacture, market, sell, offer to sell and install Licensed Attractions solely in" North America, Central America and the Caribbean Islands, and South America." (Suppl. Decl. of Justin M. Barnes In Support Of PSD's Mot. to Dismiss ("Barnes Suppl. Decl."), Ex. Q at 3, ECF No. 131.) In the agreement, Wave Loch, Inc. represented and warranted that "it is the owner of the entire right, title, and interest in and to the Licensed Rights, with no breaks in the chain of title." (*Id.* at 9.) The termination date of the agreement and license was January 1, 2007. (*Id.*)

3.     2006 License from Wave Loch, Inc. to Aquatic Development Group, Inc.

On November 18, 2006, Wave Loch, Inc. again licensed rights to several patents, including the '589 patent, to ADG. (Barnes Decl. Ex. I.) The language in the 2006 license is similar to that in the 2003 license. Wave Loch, Inc. granted ADG an exclusive "non-transferable right and license to use the Licensed Technology . . . to manufacture, market, sell, offer to sell, and install Licensed Attractions" in Canada and the United States, with certain exclusions. (*Id.* at 2-3.) The term of the agreement and license was from January 1, 2007 to January 1, 2012. (*Id.* at 8.)

Wave Loch, Inc. again warranted that "it is the owner of the entire right, title, and interest in and to the Licensed Rights, with no breaks in the chain of title thereof." (*Id.* at

4

9.)  Despite this representation, Mr. Lochtefeld declares that the representations and warranties made by Wave Loch, Inc. in this license agreement with ADG were "inadvertent errors."  (Lochtefeld Decl. ¶ 8.)  He attests that "[n]o party other than Light Wave and Surf Park has held title to the '589 patent."  (*Id.*)  Mr. Lochtefeld's declaration does not address the 2003 license from Wave Loch, Inc. to ADG.  PSD included the 2003 license agreement in its reply brief because it obtained the agreement from third-party ADG after it filed its original motion.  (Reply at 3, ECF No. 123.)

4. 2007 License from Wave Loch, Inc. to Whitewater West Industries, Ltd.

In January 2007, Wave Loch, Inc. granted a Whitewater West Industries, Ltd. ("Whitewater West") a limited "non-transferable, non-exclusive right and license to use the Licensed Rights[, defined to include the '589 patent,] to sell, and offer to sell, the Attractions . . . solely in connection with their Design Build Project, and solely in" Asia, Europe, the Middle East, and Africa.  (PSD's Notice of Suppl. Evid. Ex. A at 1-3, ECF No. 159.)  Unlike the 2003 and 2006 licenses, Wave Loch, Inc. did not expressly warrant that it was the title owner of the '589 patent, but it did represent that it "possesses certain international rights, technologies, intellectual property rights, [and] patents . . . relating to . . . the FlowRider® sheet wave ride attraction."  (*Id.* at 1.)  The agreement terminated on January 1, 2008.  (*Id.* at 7.)

5. 2009 License from Wave Loch, LLC to Whitewater West Industries, Ltd.

On February 20, 2009, Wave Loch, LLC entered a license agreement with Whitewater West Industries, Ltd.  (Decl. of Geoff Chutter In Support Of Pls.' Opp'n to Mot. to Dismiss ("Chutter Decl."), Ex. 2, ECF No. 117.)  In that agreement, Wave Loch, LLC purported to grant Whitewater West a "non-exclusive, non-transferable right and license to use the Licensed Technology," including the '589 patent, throughout the world except for the United States and Canada, and a "limited exclusive right and license to use the Licensed Technology . . . in Whitewater Projects in the Licensed Territory."  (*Id.* at 3-4.)  The term of the agreement and license is from February 20, 2009 to February 20, 2029.  (*Id.* at 13.)

Wave Loch, LLC warranted that "it is the owner of the entire right, title, and interest in and to the Licensed Rights, with no breaks in the chain of title." (*Id.* at 15.) As to this agreement, Mr. Lochtefeld again declares that Wave Loch, LLC's representations about its possession of rights was an "inadvertent error." (Lochtefeld Decl. ¶ 8.)

6. <u>2010 License from Wave Loch, LLC to Whitewater International LLC</u>

In October 2010, Wave Loch, LLC and Whitewater International LLC ("Whitewater International") executed an "Equipment Purchase and License Agreement" that authorized Whitewater International's right to use certain intellectual property rights to construct a FlowBarrel® attraction in the United Arab Emirates. (PSD's Notice of Suppl. Evid. Ex. B.) Wave Loch, LLC granted Whitewater International "only those Licensed Rights that are necessary for [Whitewater International] to install the Attraction at the Site." (*Id.* at 7.) The "Licensed Rights" is defined to include the "patents that cover the FlowBarrel attractions . . . and *may include* one or more of the patents set forth in EXHIBIT 3." (*Id.* at 3 (emphasis added.)) Exhibit 3 lists the '589 patent. (*Id.* at 18.)

7. <u>2011 Assignment from Light Wave, Ltd. to Surf Park PTE, Ltd.</u>

On May 18, 2011, Light Wave, Ltd. assigned to Surf Park PTE, Ltd. ("Surf Park") "any and all rights and interest in the Intellectual Property Rights in and to" the '589 patent. (Lochtefeld Decl., Ex. A at 335, 338.) Light Wave represented that it "is the owner of the entire right, title and interest in" the patent rights. (*Id.*) A public version of the assignment was executed on May 15, 2013, indicating an effective date of October 15, 2012. (Barnes Decl. Ex. E.) However, the assignment should have indicated an effective date of May 18, 2011. (Lochtefeld Decl. ¶ 5.) On July 18, 2013, Light Wave executed a corrected assignment document, identifying the effective date of May 18, 2011. (*Id.* Ex. B) But, the incorrect May 15, 2013 assignment was recorded with the PTO on September 27, 2016. (*Id.*) The July 18, 2013 corrected assignment was recorded on December 2, 2016. (*Id.* Ex. C.)

/ / /

8. 2011 License from Surf Park PTE, Ltd. to Whitewater International LLC

On May 19, 2011, a day after Light Wave assigned the patent rights to Surf Park PTE, Ltd., Surf Park granted Whitewater International an "exclusive, non-transferable, sublicensable right and license to use the Licensed Technology[, including the '589 patent,] . . . to manufacture, market, sell, offer to sell, import, and install Licensed Attractions" throughout the entire world, subject to certain field of use and territory exclusions. (Chutter Decl. Ex. 3.)

9. 2011 Sublicense from Whitewater West Industries, Ltd. to ADG

On November 10, 2011, "Whitewater West Industries, Ltd. and its Affiliates," affiliates defined as any agent, representative, or subsidiary of a party to the agreement, entered into a sublicense agreement with ADG for nonexclusive use of the '589 patent and other related technology. (Barnes Decl., Ex. J). Whitewater West stated that it was the licensor of the technology by means of a worldwide exclusive license from Surf Park PTE, Ltd. (*Id.* at 1.) Whitewater West warranted that it had "the legal authority" to extend the rights granted to ADG. (*Id.* at 17.)

10. 2014 License from Surf Park PTE, Ltd. to FlowRider Surf, Ltd.

On October 16, 2013, Plaintiff FlowRider Surf, Ltd. ("FlowRider Ltd.") was formed. (Chutter Decl. ¶ 3.) From the time of its creation until February 2016, Whitewater West Industries, Ltd. owned 90% of FlowRider Ltd. and Wave Loch, LLC owned 10%. (*Id.*; Chutter Decl. Ex. 1 at 1.) On January 31, 2014, FlowRider Ltd. entered into a contribution agreement with Wave Loch, LLC, in which FlowRider Ltd. purchased Wave Loch, LLC's assets. (Chutter Decl. Ex. 1.) Those assets did *not* include the '589 patent.

Rather, FlowRider Ltd. acquired the rights to the '589 patent through a license from Surf Park PTE, Ltd. (Barnes Decl. Ex. F.) Specifically, on January 31, 2014, Surf Park granted FlowRider Ltd. "an exclusive, . . . sub-licensable, royalty-bearing license to use the Licensed Rights[, including the rights to the '589 patent,] for any and all purposes and without restriction." (*Id.* at 6.) The agreement had an effective date of December 1,

2012. In the agreement, Surf Park represented that it exclusively owns the licensed rights and no third party owns or has any rights to the licensed rights. (*Id.* at 13.) Surf Park also granted FlowRider Ltd. an irrevocable, transferable, and assignable option to purchase all of Surf Park's rights, title, and interest in the licensed rights after a minimum period. (*Id.* at 16.) Concurrent with the execution of the agreement, the May 19, 2011 license that Surf Park had granted to Whitewater International LLC (which, according to the agreement, Whitewater International had assigned to Whitewater West) was terminated. (*Id.* at 17.)

11. <u>2014 Sublicense from FlowRider Surf, Ltd. to Whitewater West Industries Ltd.</u>

Upon executing the license with Surf Park, on the same day, FlowRider Ltd. granted a sublicense of those rights, including the rights to the '589 patent, to Whitewater West Industries Ltd. (Chutter Decl. Ex. 5.) Specifically, FlowRider Ltd. granted Whitewater West "an exclusive, sub-licensable, royalty-bearing license to use the Licensed Rights to make, have made, use, import, sell, offer for sale, or otherwise commercially exploit the Licensed Rights" throughout the world. (*Id.* at 5.) The sublicense did not include the option. The agreement had an effective date of December 1, 2012.

12. <u>2014 Sublicense from Whitewater West Industries, Ltd. to FlowRider, Inc.</u>

Upon receiving the sublicense from FlowRider Ltd., Whitewater West sublicensed the rights to the '589 patent and other intellectual property to FlowRider, Inc. (Chutter Decl. Ex. 6.) With an effective date of December 1, 2012, Whitewater West granted FlowRider, Inc. "an exclusive sub-licensable, royalty-bearing license to use the Licensed Rights to make, have made, use, import, sell, offer for sale, or otherwise commercially exploit the Licensed Rights" within the United States. (*Id.* at 6.) Whitewater West retained the right to two sales of products per year under certain conditions. (*Id.* at 5.) The agreement stated that the sublicense was subject to the terms of a future sublicense to ADG. (*Id.* at 6, 9.) The sublicense did not transfer the option.

8

13. <u>2014 Sublicense from Whitewater West Industries, Ltd. to Surf Waves Ltd.</u>

Whitewater West also granted an "exclusive, sub-licensable, royalty-bearing" sublicense to Plaintiff Surf Waves Ltd. to use the '589 patent rights in Europe. (Chutter Decl. Ex. 7.) The sublicense did not transfer the option.

14. <u>2016 Amalgamation of FlowRider Surf, Ltd. into Whitewater West Industries, Ltd.</u>

FlowRider Surf, Ltd. and Surf Waves, Ltd.[3] commenced this action against PSD on August 24, 2015. (Compl., ECF No. 1.) On February 1, 2016, FlowRider Ltd. and Whitewater West "amalgamated as one company" under Canadian law in the name of Whitewater West Industries, Ltd. (Barnes Decl. Ex. G.) By operation of Canadian law, on the date of the amalgamation, all of FlowRider Ltd.'s assets became the property of Whitewater West. *See* Canada Business Corporations Act, R.S.C. 1985, c. C-44, § 186 ("On the date shown in a certificate of amalgamation . . . the property of each amalgamating corporation continues to be the property of the amalgamated corporation."). Therefore, on February 1, 2016, FlowRider Ltd.'s remaining ownership interest to the '589 patent under its license with Surf Park, including the irrevocable option to purchase title, transferred to Whitewater West.

## II. Law Regarding Standing to Sue for Patent Infringement

Standing to sue is a threshold requirement in every federal action. *Sicom Sys., Ltd.*, 427 F.3d at 975. The plaintiff bears the burden of establishing that it has standing at the time it files suit. *Id.* In addition to Article III standing, a plaintiff in a patent infringement action must possess standing as defined by the Patent Act. *Drone Techs., Inc. v. Parrot S.A.*, 838 F.3d 1283, 1292 (Fed. Cir. 2016). Under the Patent Act, only "patentees" may bring an action for infringement. 35 U.S.C. § 281. Patentees include

---

[3] Surf Waves, Ltd. is the owner of the other patent-in-suit, the '016 patent. PSD does not challenge Surf Waves, Ltd.'s standing.

"not only the patentee to whom the patent was issued but also the successors in title to the patentee." § 100(d).

There are two types of "successors in title" that may have standing to sue on their own. The first are assignees. An assignment transfers title to the patent. *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1116 (Fed. Cir. 1996). The second are exclusive licensees holding "all substantial rights" to the patent. *Prima Tek II LLC v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000). When a patent owner grants an exclusive license that transfers "all substantial rights" to the patent, the license is tantamount to an assignment and the "exclusive licensee has sole standing to sue those suspected of infringing." *Alfred E. Mann Found. v. Cochlear Corp.*, 604 F.3d 1354, 1359 (Fed. Cir. 2010). "[W]here an exclusive license transfers less than 'all substantial rights' in the patents to the exclusive licensee, the exclusive licensee may still be permitted to bring suit against infringers, but the patent owner is an indispensable party who must be joined." *Id.* Nonexclusive licensees have no standing to sue or even join a suit with the patentee because they suffer no legal injury from infringement. *Id.* at 1360; *Sicom Sys.*, 427 F.3d at 976.

To determine whether a license agreement conveys all substantial rights in a patent, and thus constitutes an assignment for standing purposes, a court "must ascertain the intention of the parties [to the license agreement] and examine the substance of what was granted." *Id.* State law governs the interpretation of contracts generally. *DDB Techs., L.L.C. v. MLB Adv. Media, L.P.*, 517 F.3d 1284, 1290 (Fed Cir. 2008). The Federal Circuit has identified certain rights that should be examined to determine whether a licensor transferred away sufficient rights to render an exclusive licensee the owner of a patent. *Mann Found.*, 604 F.3d at 1360-61. Those rights include:

(1) The exclusive right to make, use, and sell products or services under the patent;

(2) The scope of the licensee's right to sublicense;

(3) The nature of the license provisions regarding reversion of rights to the licensor following breaches of the license agreement;

10

(4) The right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee;

(5) The duration of the license rights granted to the licensee;

(6) The ability of the licensor to supervise and control the licensee's activities;

(7) The obligation of the licensor to continue paying patent maintenance fees;

(8) The nature of any limits on the licensee's right to assign its interests in the patent; and

(9) The nature and scope of the exclusive licensee's purported right to bring suit, together with the nature and scope of any right to sue purportedly retained by the licensor.

*Id.* This last factor "is the most important consideration." *Id.* at 1361.

A patent may not have multiple separate owners for purposes of determining standing to sue. *Id.* at 1359.[4] "Either the licensor did not transfer 'all substantial rights' to the exclusive licensee, in which case the licensor remains the owner of the patent and retains the right to sue for infringement, or the licensor did transfer 'all substantial rights' to the exclusive licensee, in which case the licensee becomes the owner of the patent for standing purposes and gains the right to sue on its own." *Id.* at 1359-60. The court must determine the owner, and that owner is the only party with standing to sue on its own. *Id.* at 1359 n.2

## III. Discussion

The numerous license agreements and assignments demonstrate a chain of title beginning with the inventor and leading to Plaintiff FlowRider Surf, Ltd. and its owner Whitewater West Industries, Ltd., as well as numerous other transfers of rights to the

---

[4] "Of course, the patent may be owned by a group, as when a patent with multiple named inventors first issues. But, at least for purposes of determining standing to sue for infringement, there may not be multiple groups or unaffiliated individuals who claim ownership of the patent; one of these groups or individuals must be determined to be the owner." *Mann Found.*, 604 F.3d at 1359 n.2.

'589 patent that occurred outside that chain. The chain began with Mr. Lochtefeld. He assigned title and rights to Light Wave, Ltd., which then assigned title and rights to Surf Park PTE, Ltd. Surf Park exclusively licensed rights to Plaintiff FlowRider Surf, Ltd., which, in turn, exclusively licensed rights to Whitewater West Industries, Ltd. Whitewater West then executed two purportedly exclusive sublicenses of the '589 patent rights to FlowRider, Inc. and Surf Waves, Ltd. This all happened before this lawsuit began. After Plaintiffs filed this action, FlowRider Ltd. and Whitewater West amalgamated as one company under the name Whitewater West.

Outside of this chain, a number of license agreements exist. Those agreements are the 2003 exclusive license from Wave Loch, Inc. to ADG, the 2006 exclusive license from Wave Loch, Inc. to ADG, the 2007 nonexclusive license from Wave Loch, Inc. to Whitewater West, the 2009 nonexclusive license from Wave Loch, LLC to Whitewater West, the 2010 equipment purchase and license agreement from Wave Loch, LLC to Whitewater International, and the 2011 nonexclusive license from Whitewater West to ADG.

Defendant PSD first argues that the Wave Loch entities' repeated statements of ownership break the chain of title. Plaintiffs counter that no party other than Light Wave, Ltd. and Surf Park PTE, Ltd. held title to the '589 patent and representations to the contrary are "inadvertent errors." (Lochtefeld Decl. ¶ 8.) However, even if Wave Loch, Inc., Wave Loch, LLC, or Whitewater West never held title to the patent, they still could have transferred rights to use the patent. Plaintiffs do not explain how Wave Loch, Inc., Wave Loch, LLC, or Whitewater West had the authority to license rights to the '589 patent. Perhaps one of those entities received a license from Light Wave, Ltd. or Surf Park PTE, Ltd., the assignees at the time of the agreements. Or perhaps the licensors acted without authority. Plaintiffs do not answer this question. The Court is troubled by these various agreements that occurred untethered from the chain of title. Nevertheless, the Court need not resolve the effect of these out-of-chain agreements because problems within the chain demonstrate that Plaintiff FlowRider Ltd. lacks standing.

Even if the out-of-chain agreements do not break the chain of title, FlowRider Ltd. was never the proper plaintiff. Rather, Whitewater West held all substantial rights in the patent at the time this lawsuit was filed. Surf Park granted an exclusive license of all substantial rights to the '589 patent to FlowRider Ltd. and, in turn, FlowRider Ltd. granted Whitewater West all of its rights under the agreement with Surf Park, except the option. Whitewater West should have been the named plaintiff from the beginning of this lawsuit.

When Surf Park granted a license to FlowRider Ltd., FlowRider Ltd. obtained two of the most important rights indicating that an exclusive licensee has all substantial rights. First, Surf Park granted FlowRider Ltd. "an exclusive, even as to [Surf Park], sub-licensable, royalty-bearing license to use the Licensed Rights for any and all purposes and without restriction" throughout the world until November 30, 2022. (Barnes Decl. Ex. F at 6.) The transfer of an exclusive right to use the patent rights is "vitally important" to determining whether the license is tantamount to an assignment. *See Mann Found.*, 604 F.3d at 1360. Second, FlowRider Ltd. obtained "the first right, but not the obligation, to enforce any of the Licensed Rights against any third party" and "the sole and exclusive right to settle or resolve any claims with respect to the Licensed Rights without the express written consent of" Surf Park. (Barnes Decl. Ex. F at 12.) If FlowRider elected not to sue an alleged infringer, Surf Park could pursue the litigation but "under no circumstances shall [Surf Park] settle or resolve such action or claim without [FlowRider Ltd.'s] prior written consent." (*Id.* at 12-13.) Thus, under the agreement, FlowRider Ltd. remains in control of any litigation, even that initiated by Surf Park. Such a broad right given to FlowRider Ltd., and the corresponding loss of that right by Surf Park, demonstrates that Surf Park transferred substantial rights to FlowRider Ltd. *See Mann Found.*, 604 F.3d at 1361 (stating that the right to sue is the most important factor).

FlowRider Ltd. also received several other rights in the agreement, and Surf Park gave up other rights, all of which combine to demonstrate that the license is the

functional equivalent of an assignment.  Surf Park granted FlowRider Ltd. "an irrevocable, transferrable, and assignable option to purchase" all of Surf Park's rights after a minimum period.  (Barnes Decl. Ex. F at 16.)  Surf Park agreed that it would not license, authorize, or assist any person, other than FlowRider Ltd., to exploit the licensed rights.  (*Id.* at 6.)  The license also prevents Surf Park from assigning the agreement without the prior written consent of FlowRider Ltd.  (*Id.* at 22.)  FlowRider Ltd. received a right to sublicense, subject only to Surf Park's right to veto potential sublicensees that either were not affiliated with FlowRider or declined to use an approved proforma sublicense agreement.  (*Id.* at 6.)  However, Surf Park's limited veto right is a "minor derogation from the grant of rights" that does "not substantially interfere with the full use by [FlowRider Ltd.] of the exclusive rights under the patent." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991) (holding that licensor's sublicensing veto right did not divest licensee of standing); *Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1191 (Fed. Cir. 2007) (explaining that licensor retained significant rights where agreement expressly indicated that licensor could veto any transfer of licensee's rights, even if the veto is exercised "arbitrarily").

Further, FlowRider Ltd. received the "exclusive right to prosecute and maintain the Licensed Rights." (Barnes Decl. Ex. F at 9.)  FlowRider Ltd. is responsible for all costs, fees, and other expenses related to such prosecution and maintenance.  (*Id.* at 10.)  This is another indication that FlowRider Ltd. received all substantial rights. *See Propat Int'l*, 473 F.3d at 1191 ("The responsibility to maintain a patent is one of the obligations that has been recognized by this court as an indication that the party with that obligation has retained an ownership interest in the patent.")  Further, Surf Park cannot unilaterally terminate the license unless FlowRider Ltd. ceases to exist, enters liquidation, or becomes insolvent.  (Barnes Decl. Ex. F at 17.)  Rather, in the event that either party is in material breach or the parties have a dispute, they must enter arbitration but "under no circumstances shall any remedy or arbitration award include the termination of" the agreement, "except to the extent agreed to in writing by the Parties." (*Id.* at 18, 24.)  Surf

Park's limited ability to terminate the agreement further shows that it granted substantial rights to FlowRider Ltd. *See Propat Int'l*, 473 F.3d at 1191-92 (finding that licensor retained significant rights where licensor could terminate the agreement and end all of licensee's rights in the patent if licensee failed to perform to certain benchmarks).

Considering all of these factors, Surf Park conveyed all substantial rights in the '589 patent to FlowRider Ltd. The exclusive license is, in effect, an assignment. *See Prima Tek II*, 222 F.3d at 1377. Had FlowRider Ltd. done nothing with these rights, it would be the proper plaintiff in this action. However, on the very same day that Surf Park granted all substantial rights to FlowRider Ltd., FlowRider Ltd. transferred all of those rights to Whitewater West. FlowRider Ltd.'s agreement with Whitewater West specifically states that FlowRider Ltd. "desires to grant to [Whitewater West] an exclusive sublicense of all of FlowRider's rights under the License Agreement [between FlowRider Ltd. and Surf Park], other than the Option." (Chutter Decl. Ex. 5 at 1.) Even Plaintiffs admit that "[u]pon execution of its license with Surf Park, [FlowRider Ltd.] transferred all of its substantial rights in the '589 Patent to Whitewater" West. (Opp'n to Mot. to Dismiss at 16, 22.) An examination of the sublicense agreement confirms that Whitewater West received all substantial rights and should have been the named plaintiff.

First, FlowRider Ltd. granted Whitewater West "an exclusive, sub-licensable, royalty-bearing license to use the Licensed Rights to make, have made, use, import, sell, offer for sale, or otherwise commercially exploit the Licensed Rights and Licensed Products" throughout the world. (Chutter Decl. Ex. 5 at 5.) *See Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1341 (Fed. Cir. 2007) ("The grant of this exclusive license and the right to sublicense constituted a transfer of the exclusionary rights to the patent."); *Prima Tek II*, 222 F.3d at 1380 (explaining that grant of sublicense eliminated sublicensor's right to exclude others from practicing the patents because that right flowed to sublicensee). The duration of the agreement is "ongoing unless earlier terminated in accordance with" the agreement. (Chutter Decl. Ex. 5 at 5.) *See Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006) (holding that where licensee

15

had rights to the patent for only a limited portion of the patent term, licensee did not hold all substantial rights). Whitewater West can sublicense the rights it received, with the only exception being if the "sublicense arrangement us[es] an agreement other than the Proforma Sublicense." (Chutter Decl. Ex. 5 at 5.) In that case, Surf Park and FlowRider Ltd.'s approval is necessary. (*Id.*) The agreement does not explicitly permit Whitewater West to assign its interests in the sublicense, but only restricts Whitewater West from doing so without FlowRider Ltd. and Surf Park's consent when the assignment is to a party unaffiliated with FlowRider Ltd. (*Id.* at 15.) These limited restrictions on Whitewater West's transfer rights support finding that it received all substantial rights from FlowRider Ltd.

Importantly, the license gave Whitewater West "the first right, but not the obligation, to enforce any of the Licensed Rights." (*Id.* at 10.) The agreement also specified that "FlowRider shall have no interest in the proceeds actually received by [Whitewater West] as a result of prosecuting such action or claim" and that Whitewater West "shall have the sole and exclusive right to settle or resolve any claims with respect to the Licensed Rights without the express written consent of FlowRider" Ltd. (*Id.*) The agreement does not specify the nature and scope of FlowRider Ltd.'s right to sue should Whitewater West decline to initiate litigation. As between the parties, Whitewater West has the first right to arbitrate any disputes with Wave Loch, LLC or Surf Park and has the "sole and exclusive right to settle or resolve any claims with respect to any disputes and arbitration settlement." (*Id.*) Therefore, Whitewater West gained the substantial right to exclude others from making, using, and selling the claimed invention and to control resolution of disputes.

Whitewater West received additional rights demonstrating that it is the effective owner of the patent for standing purposes. Whitewater West has "the exclusive right to prosecute and maintain the Licensed Rights." (*Id.*) It is responsible "for all costs, fees, and other expenses related to such prosecution and maintenance." (*Id.*) *See Propat Int'l*, 473 F.3d at 1191. Further, FlowRider Ltd.'s ability to terminate the agreement is limited

to situations when Whitewater West ceases to exist, enters liquidation, or becomes insolvent. (Chutter Decl. Ex. 5 at 12.) *See Propat Int'l*, 473 F.3d at 1191-92.

In sum, FlowRider Ltd. did not retain the substantial rights it received from Surf Park. Instead, it explicitly granted all of those rights, other than the option to purchase, to Whitewater West. The fact that FlowRider Ltd. *may eventually* gain title to the '589 patent from Surf Park does not persuade the Court that FlowRider Ltd. retained all substantial rights.[5] Indeed, Plaintiffs agree that all substantial rights transferred to Whitewater West. (Opp'n to Mot. to Dismiss at 16, 22.)

The sublicenses that Whitewater West granted to FlowRider, Inc. and Surf Waves Ltd. did not transfer all substantial rights to those sublicensees. First, the exclusive sublicense to Surf Waves, Ltd. extended only to Europe. As such, such a right does not give Surf Waves standing to sue in the United States. *See* 35 U.S.C. § 154; *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1033 (Fed. Cir. 1995) ("[A] U.S. patent grants rights to exclude others from making, using and selling the patented invention only *in the United States.*" (emphasis in original)).

Second, Whitewater West's purportedly exclusive sublicense to FlowRider, Inc. did not grant FlowRider, Inc. all substantial rights. Whitewater West retained the right to two sales of products per year in the licensed territory, the exclusive right to prosecute and maintain the licensed patents, the first right to bring an infringement action against a third party, and the sole and exclusive right to settle or resolve any claims against third parties without the express and written consent of FlowRider, Inc. The rights Whitewater West granted FlowRider, Inc. are also subject to a further sublicense to ADG. *See Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995) (licensee lacked independent standing to sue where patent owner retained limited right to make, use and

---

[5] The option to purchase has not vested yet. Surf Park granted the option to purchase, exercisable after a minimum of five years, beginning October 31, 2012. (Barnes Decl. Ex. F at 4, 16.)

sell patented products; license was subject to prior licenses; and licensor retained right to bring infringement action).

Despite Plaintiffs' admission that Whitewater West held all substantial rights at the time they filed their complaint, they contend that there is no standing problem because Whitewater West brought this suit in the name of FlowRider Surf, Ltd., as required by section 5.3 of the sublicense. That section states that "[a]s between the Parties, Sub licensee [Whitewater West] shall have the first right, but not the obligation, to enforce any of the Licensed Rights against any third party *in the name of Flowrider*." (Chutter Decl. Ex. 5 at 10 (emphasis added.)) Plaintiffs contend that "Whitewater has, therefore, been part of this case from the outset when it brought the action, per the terms of the 2014 Whitewater License, in the name of" FlowRider Surf, Ltd. (Opp'n to Mot. to Dismiss at 16.) Whitewater's CEO declares that all positions taken by Plaintiffs FlowRider Surf, Ltd. and Surf Waves, Ltd. have been with the knowledge and consent of Whitewater and its principals. (Chutter Decl. ¶ 11.) They argue that, due to the amalgamation, the Court should substitute Whitewater West for FlowRider Ltd.

The Court notes that Plaintiffs' contention that Whitewater West has been acting as co-plaintiff in this case since the beginning is new. This Court has treated Whitewater West as a third party. (*See* Claim Construction Order at 1, ECF No. 88.) Defendant has too, as it subpoenaed Whitewater West. (Opp'n to Mot. to Substitute at 12; Reply to Mot. to Substitute at 7.) Plaintiffs' current position also contradicts the requirements of the local rules, which require the plaintiff to produce "[d]ocuments sufficient to evidence ownership of the patent rights" within 14 days of the initial case management conference. Patent L.R. 3.2(d). This production was due in December 2015. (Case Management Conference Order at 2, ECF No. 22.) However, FlowRider Ltd. now concedes that the patent owner at the time this suit was filed was Whitewater West.

Plaintiffs' argument that the contract language required them to sue in the name of FlowRider Surf, Ltd. asks this Court to ignore constitutional and statutory requirements for standing. "[A] contract cannot change the . . . requirement for suit to be brought by

18

the 'patentee.'" *Ortho Pharm.*, 52 F.3d at 1034. Plaintiffs admit that the patentee—the entity holding all substantial rights—is Whitewater West. When a license transfers all substantial rights, "the licensee may sue but the licensor may not." *Mann Found.*, 604 F.3d at 1359; *Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1031-34 (Fed Cir. 2015) (holding that where licensor transferred all substantial rights to licensee and retained no substantial rights for itself, licensee alone has standing to sue). Thus, Whitewater West should have been the named plaintiff at the time this lawsuit was filed, not FlowRider Ltd. *See Morrow*, 499 F.3d at 1340 ("When a party holds all rights or all substantial rights, it alone has standing to sue for infringement.").

Plaintiffs' argument also ignores the rest of the language in section 5.3 of the sublicense, which contemplates Whitewater West and FlowRider Ltd. being two different parties. The section states that if Whitewater West initiates an action and requests FlowRider Ltd.'s joinder, FlowRider Ltd. "agrees to join as a party plaintiff." (Chutter Decl. Ex. 5 at 10.) Thus, the section foresees the inclusion of FlowRider Ltd. as a co-plaintiff with Whitewater West. Moreover, "FlowRider shall have no interest in the proceeds actually received by" Whitewater West and Whitewater West "shall have the sole and exclusive right to settle . . . without the express written consent of FlowRider" Ltd. (*Id.*) These provisions treat Whitewater West and FlowRider Ltd. as different entities.

Ultimately, Plaintiffs bear the burden of establishing standing to sue. They have not met that burden. The Court **GRANTS** the motion to dismiss FlowRider Surf, Ltd. and the '589 patent without prejudice. *See Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, 569 F.3d 1328, 1332 (Fed. Cir. 2009) (explaining that because a dismissal for lack of standing is not an adjudication on the merits, dismissal should generally be without prejudice). Accordingly, the Court **DENIES** the motion to substitute.

/ / /

/ / /

/ / /

## IV. Motion to Stay

With the dismissal of '589 patent, the only patent that remains in this lawsuit is the '016 patent. On January 30, 2017, the PTAB granted *inter partes* review ("IPR") of the '016 patent. The PTAB concluded that "there is a reasonable likelihood that [PSD will] prevail in establishing the unpatentability of claims 1–20" of the '016 patent. (Decl. of Justin M. Barnes In Support Of PSD's Renewed Motion to Stay, Ex. A at 2.) PSD moves to stay this case during the IPR review.

Courts have discretion to stay proceedings pending conclusion of a PTAB reexamination. *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988). A stay is appropriate where "the outcome of the reexamination would be likely to assist the court in determining patent validity and, if the claims were canceled in the reexamination, would eliminate the need to try the infringement issue." *In re Cygnus Telecomms. Tech., LLC Patent Litig.*, 385 F. Supp. 2d 1022, 1023 (N.D. Cal. 2005) (citing *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1342 (Fed. Cir. 1983)). However, a stay is not automatic. *Slip Track Sys., Inc. v. Metal Lite, Inc.*, 159 F.3d 1337, 1341-42 (Fed. Cir. 1998) (explaining that if actions concurrently pending before the court and PTAB are "neither duplicative nor dependent on one another, there is neither any need nor any justification" for a stay). Courts consider the following three factors when deciding whether to stay proceedings: (1) whether discovery is complete and whether a trial date has been set; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the nonmoving party. *In re Cygnus*, 385 F. Supp. 2d at 1023.

The Court finds that these factors weigh in favor of a stay. As to the first factor, fact discovery is complete, but the close of expert discovery is two months away. The parties still must brief summary judgment and *Daubert* motions and prepare for the pretrial conference and subsequent trial. The pretrial conference—the point at which the Court will set the trial date—is still four months away. Thus, although this case is not in its infancy, it is not so advanced that a stay is inappropriate. *See, e.g.*, *PersonalWeb*

*Techs., LLC v. Facebook, Inc.*, No. 5:13-cv-01356-EJD, 2014 WL 116340, at *2 (N.D. Cal. Jan. 13, 2014) (finding stage of litigation factor weighed in favor of stay where "a claim construction order has been issued and the close of fact discovery is fast approaching," but "a substantial portion of the work—expert discovery, summary judgment, pre-trial preparation, and trial itself—lies ahead"); *Software Rights Archive, LLC v. Facebook, Inc.*, No. C-12-3970, 2013 WL 5225522, at *3 (N.D. Cal. Sept. 17, 2013) (stage of litigation factor weighed in favor of stay even after "over 150,000 pages of documents" had been produced).

The second factor also weighs in favor of a stay. Certainly, the PTAB's review of the only remaining patent-in-suit, the '016 patent, will clarify and streamline the issues before this Court. The PTAB's review will either (1) invalidate the asserted claims and reduce the number of issues before this Court, or (2) find the claims valid, in which case PSD will be estopped from asserting those invalidity contentions here. Thus, the review of the '016 patent will streamline the issues for trial.

The last factor, prejudice to remaining Plaintiff Surf Waves, Ltd., does not favor a stay. When considering the "undue prejudice" factor, courts look for evidence of "dilatory motives or tactics." *Asetek Holdings, Inc. v. Cooler Master Co.*, No. 13-cv-457, 2014 WL 1350813, at *4 (N.D. Cal. Apr. 3, 2014) (quoting *KLA-Tencor Corp. v. Nanometrics, Inc.*, No. 05-cv-03116, 2006 WL 708661, at *3 (N.D. Cal. Mar. 16, 2006)). In making this evaluation, courts have considered factors which include: (1) the timing of the reexamination request; (2) the timing of the request for stay; (3) the status of reexamination proceedings; and (4) the relationship of the parties. *Id.* (citation omitted).

The Court previously found that the timing of PSD's reexamination request suggested dilatory motives. PSD filed its IPR petition for the '016 patent on July 18, 2016, and its petition for review of the '589 patent on August 24, 2016, just days before the statutory filing deadline of August 28, 2016. PSD also filed the petitions over two

/ / /

/ / /

years after it first became aware of Plaintiffs' infringement claims.[6]  Nevertheless, upon receiving the PTAB's decision to institute review on the '016 patent, PSD immediately moved for a stay.

Courts also consider whether the parties are direct competitors and how a stay might prejudice the nonmovant.  Although PSD disputes whether the parties compete, the evidence strongly suggests that Surf Waves and PSD directly compete.  The Court's concerns about prejudice, however, are mitigated by the fact that Plaintiffs allege that only two of the nine Accused Products infringe the '016 patent.  In contrast, Plaintiffs argue that the '589 patent is the "primary patent at issue," and they accuse all nine of PSD's products of infringing the '589 patent.  (Opp'n to Mot. to Stay at 20, ECF No. 174).  As that patent has been dismissed, the primary reason for denying the stay is gone.  The Court's concerns about prejudice are further tempered by the limited duration of the stay, as ordered below.

Considering all the factors, the Court will grant a limited stay of this action for six (6) months.  The stay will lift automatically at the conclusion of the 6-month period.  On the day the stay expires, the parties must file a joint report about the status of the case.

## CONCLUSION

In conclusion, it is hereby **ORDERED:**

(1) PSD's motion to dismiss U.S. Patent 6,491,589 for lack of subject matter jurisdiction is **GRANTED** (ECF No. 102);

(2) Plaintiffs' motion to substitute parties is **DENIED** (ECF No. 106);

(3) The '589 patent and Plaintiff FlowRider Surf, Ltd. are **DISMISSED WITHOUT PREJUDICE;**

---

[6] Plaintiffs initially filed suit against Defendant for infringement of the patents-in-suit on May 1, 2014, but those actions were voluntarily dismissed without prejudice.  *See FlowRider Surf, Ltd. v. Alleshouse et al.*, No. 14-cv-1110 GPC (BLM) (S.D. Cal. 2014); *Surf Waves Ltd. v. Pac. Surf Designs, Inc.*, No. 14-cv-1108 BEN (JMA) (S.D. Cal. 2014).

(4) PSD's renewed motion to stay pending *inter partes* review is **GRANTED.** (ECF No. 169.)[7] This action will be **STAYED** for six months.

**IT IS SO ORDERED.**

Dated:  May 26, 2017

Hon. Roger T. Benitez
United States District Judge

---

[7] The Court **DENIES** PSD's initial motion to stay as moot. (ECF No. 142.)